# **EXHIBIT 3**

**GEORGETOWN LAW**
Center for the Study of the Legal Profession

PEER MONITOR®



# 2014 Report on the State of the Legal Market

*The Center for the Study of the Legal Profession at the Georgetown University Law Center and Thomson Reuters Peer Monitor are pleased to present this 2014 Report setting out our views of the dominant trends impacting the legal market in 2013 and key issues likely to influence the market in 2014 and beyond.* [1]

## Introduction – Is Bigger Always Better?



There is a famous scene in the 1975 award-winning Steven Spielberg movie *Jaws*, when the Amity Police Chief Martin Brody (played by Roy Scheider) first catches a glimpse of the 25-foot long great white shark that has been terrorizing his community and that he is then chasing in a small fishing boat. Stunned by what he has seen, Brody backs into the cabin of the boat and grimly remarks to Quint, the seasoned shark hunter, "You're gonna need a bigger boat."

In an admittedly different context, one could argue that this same advice has been the most prominent driver of law firm strategies over the past decade or so. In large measure, most law firm leaders -- both before and since the Great Recession -- have appeared fixated on building "a bigger boat" as the keystone of their vision for moving their firms forward. Driven by a desire to achieve perceived economies of scale, to better serve client needs, to mirror the actions of competitors, or to improve their rankings in industry statistics, law firms have pursued aggressive growth strategies -- before 2008, through ever increasing hiring quotas and, since 2008, primarily through lateral hiring and mergers.[2]

The past year saw an overall continuation of this trend, although some firms have begun to retrench. According to *The National Law Journal*, the 350 largest U.S. law firms grew by only 1.1 percent during 2012, as compared to 1.7 percent growth in 2011. And, interestingly, some 140 firms on the NLJ 350 list (or about 40 percent of the group) actually shrank in size as compared to the prior year.[3] At the same time, 2013 was a record year for law firm mergers, and lateral acquisitions continued apace.

By early December, the number of reported mergers involving U.S. law firms (91) had already surpassed the previous record (70) set in 2008, and it was widely expected that the year-end total would be even higher.[4]

---

[1] The Center for the Study of the Legal Profession and Thomson Reuters Peer Monitor gratefully acknowledge the participation of the following persons in the preparation of this Report: from the Center for the Study of the Legal Profession – James W. Jones, Senior Fellow (lead author) and Milton C. Regan, Jr., Professor of Law and Co-Director; and from Thomson Reuters Peer Monitor – Mark Medice, Senior Director and Jennifer Roberts, Data Analyst.

[2] The dramatic growth in the size of law firms has been a major feature of the legal market for the past 50 years. In 2012, *The National Law Journal's* NLJ 350 list showed that the 350th largest law firm in the U.S. had 112 lawyers. That compared starkly to 1965, when the largest law firm in the U.S. had only 125 lawyers.

[3] "The NLJ 350," *The National Law Journal*, July 6, 2013.

[4] "Big Firm Tie-Ups Abroad Keep 2013 Merger Mania Alive," *The AmLaw Daily*, Dec. 12, 2013. The article also describes high levels of merger activity in the United Kingdom, Canada, and South Africa.

While year-end figures on lateral moves among U.S. law firms are not yet available, it is expected that they will reflect a continuation of the high level of lateral partner activity that we have seen in the market in recent years.[5] In addition, in a recent survey of leaders of AmLaw 200 firms, *The American Lawyer* found that a whopping 80 percent of respondents expected to make lateral partner hires in litigation related practice areas during 2014.[6]

Against this background, this report will examine the continuing dominant role that growth appears to play in the strategic thinking of most U.S. law firms. We will ask whether building "a bigger boat" is always the right strategy for firms and will consider some of the challenges that growth -- particularly rapid growth -- poses for law firm leaders. Finally, we will suggest other areas of focus that we believe may be far more relevant to the success of law firms in the future. The starting place for our inquiry, however, must be a look at the state of today's legal market and the ways in which competition in the market has changed fundamentally since 2008.

# Current State of the Legal Market - By the Numbers

By most indicators, 2013 was another flat year for economic growth in U.S. law firms, with continuing sluggish demand growth, persistent challenges of low productivity, ongoing client pushback on rate increases, and a continuing struggle to maintain discipline on expenses. Although the performance of individual firms obviously differed, with some performing well above market averages, on the whole the financial performance of the U.S. legal market remained fairly lackluster during the year.

## Demand Growth

Demand for legal services in 2013 declined slightly across the industry, as tracked in the Thomson Reuters Peer Monitor data base.[7] As shown in Chart 1 below (which tracks performance on a year-to-date basis through November), after a sharp decline in the first quarter,[8] demand growth recovered somewhat ending at a slightly negative level of -1.1 percent for the 12-month period measured. While a clear improvement over the collapse in demand growth seen in 2009 (when growth hit a negative 5.1 percent level), the current demand growth rate has been essentially flat to somewhat negative for the past three years.

---

5 In February 2013, in its annual Lateral Report, *The American Lawyer* noted that lateral partner moves among AmLaw 200 firms jumped 9.7 percent over the prior year for the 12-month period ending September 30, 2012, and 33.6 percent over a similar period in 2010. Even taking into account the fact that 280 of the 2,691 lateral partner moves in 2012 were attributable to the failure of a single firm (Dewey & LeBoeuf), the increased level of activity was noteworthy. "The 2013 Lateral Report," *The American Lawyer*, Mar. 1, 2013.

6 Richard Lloyd, "Firm Leaders Survey: Slow Growth on Tap for 2014," *The American Lawyer*, Dec. 2, 2013.

7 Thomson Reuters Peer Monitor data ("Peer Monitor data") are based on reported results from 130 law firms, including 53 AmLaw 100 firms, 38 AmLaw 2nd 100 firms, and 39 additional firms. For present purposes, "demand for legal services" is viewed as equivalent to total billable hours recorded by firms included in a particular data base.

8 It is worth noting that the sharp decline in demand growth during the first quarter of 2013 followed an upswing in demand in the fourth quarter of 2012, an increase at least partly attributable to the desire of many clients to close various corporate transactions in advance of new tax rules that took effect on January 1, 2013.

2

## Chart 1 - Growth in Demand for Legal Services



Source: Thomson Reuters Peer Monitor

As shown in Chart 2 below, among various practice areas, when measured on a 2013 year-to-date comparative basis, real estate showed the highest demand growth, albeit at a modest 1.2 percent level, followed by labor and employment at 0.4 percent. Corporate practices were essentially flat, and all other practices saw declines.

## Chart 2 - Demand Growth by Practices



Source: Thomson Reuters Peer Monitor

# Productivity

During 2013, the number of lawyers in U.S. firms grew by about 1 percent. Given the slight decline in overall demand growth, it is not surprising, therefore, that productivity -- defined as the total number of billable hours recorded by a firm divided by the total number of lawyers in the firm -- remained essentially flat.

3

As can be seen in Chart 3 below, this continues a trend that we have seen for the last several years.[9] What remains significant, however, is that current levels of productivity are still over 100 billable hours per timekeeper per year lower than in the pre-recession period in 2007.

Moreover, 2013 saw a continuation of the familiar pattern of associate billable hours exceeding those of equity partners by some 100-120 hours per year, and equity partner billable hours exceeding those of other categories of lawyers (including non-equity partners, of counsel, senior counsel, special counsel, etc.) by some 300 hours per year. All of this as shown in Chart 3 evidences an ongoing problem of under productivity in the latter categories of lawyers.



Chart 3 - Productivity (Hours per Lawyer) by Category

Source: Thomson Reuters Peer Monitor                                Lawyers Only

## Rates and Realization

As has been the case since the beginning of the Great Recession in 2008, firms continued to raise their rates during 2013, albeit at a fairly modest level of 3.5 percent (well below the 6-8 percent annual increases typical in the pre-2008 period). And, as has also been the case for the past five years, clients continued to push back on rate increases, keeping pressure on the realization rates that firms were able to achieve.

Chart 4 below shows the rate progression as tracked in the Peer Monitor data base from the third quarter of 2010 through November 2013. As can be seen, over this three-year period, firms increased their standard rates by 11 percent from an average of $429 per hour to $476 (or an average increase of about 3.7 percent per year). At the same time, however, the collected rates actually achieved by firms increased by only 8.8 percent from an average of $363 per hour to $395 (or an average increase of 2.9 percent).

---

9  There was an uptick in productivity during October 2013, but – based on data from prior years – this appears to be a fairly typical seasonal anomaly with October hours generally being counterbalanced by lower billable hours for the remainder of the fourth quarter.

4

## Chart 4 - Rate Progression



Source: Thomson Reuters Peer Monitor

These results, which reflect continuing client resistance to firm rate hikes, are also reflected in firm realization rates over the same period. As can be seen in Chart 5 below, over the three-year period from the third quarter of 2010 through the third quarter of 2013, realization rates – i.e., the percentages of work performed at a firm's standard rates that are actually billed to and collected from clients -- have continued to decline. Billing realization dropped from 89.12 percent to 86.74 percent, while collected realization dropped from 85.32 percent to 83.49 percent (a rate that is slightly lower than the record low rate of 83.6 percent seen in 2012). What this means, of course, is that -- on average -- law firms are collecting only 83.5 cents for every $1.00 of standard time they record. To understand the full impact, one need only consider that at the end of 2007, the collected realization rate was at the 92 percent level.

## Chart 5 - Billed and Collected Rates against Standard



Source: Thomson Reuters Peer Monitor

# Expenses

One of the challenges of managing in a slow growth economy is keeping a tight rein on expenses -- both direct and indirect.[10] Prior to the onset of the economic downturn in 2008, by any rational measure expenses in law firms were largely out of control. In the fourth quarter of 2007, for example, direct expenses of U.S. law firms (measured on a rolling 12-month year-over-year percentage change basis) were growing at an average annual rate of 18 percent, while indirect expenses were growing at 10.9 percent. With the beginning of the recession in 2008, almost all firms slashed expenses across the board, hitting negative growth rates in the second quarter of 2010 of -8.2 percent for direct expenses and -2.9 percent for indirect. Those reduced levels of spending -- induced primarily by panicked reactions to the economic crisis -- were not sustainable over the long term, and expenses began to rise again toward the end of 2010. Since that time, as shown in Chart 6 below, although expense growth has increased -- in 2013 up to 2.1 percent for both direct and indirect expenses -- firms have done a reasonably good job of managing their expenses effectively.

## Chart 6 - Expense Growth



Source: Thomson Reuters Peer Monitor

# Profits per Partner

The continuing combination of sluggish demand growth, constrained productivity, and low realization rates have combined to keep profits per partner ("PPP") relatively flat over the past three years. As shown on Chart 7 below, while PPP in 2013[11] was up slightly for all categories of firms across the market, the increase over 2012 was quite modest and, at least in the case of AmLaw 100 and mid-sized firms, lower than levels in 2011.[12]

---

10 Direct expenses refer to those expenses related to fee earners (primarily the compensation and benefits costs of lawyers and other timekeepers). Indirect expenses refer to all other expenses of the firm (including occupancy costs, technology, administrative staff, etc.).

11 The PPP shown on Chart 7 for 2013 is based on YTD October numbers.

12 It should be noted that Peer Monitor includes in its "profits per partner" number *all* lawyers listed by firms as "partners" (whether equity or non-equity or income). This approach facilitates easier comparisons between firms than a "profits per equity partner" measure and eliminates questions about how firms define "equity partners."

6

## Chart 7 - Profits per Partner



Source: Thomson Reuters Peer Monitor

# Changed Basis of Competition in the Legal Market

The current trends described above reflect fundamental changes in the nature of competition in the legal market, changes that have been increasingly evident since 2008. Although many factors have contributed to these changes, some of them unrelated to the economic downturn,[13] the onset of the Great Recession accelerated (and, to some extent, exacerbated) the pace of change across the market.

The first and perhaps most obvious change is that the legal market has become much more intensely competitive than it was five years ago. This is hardly surprising since, for the past five years, the supply of legal services has significantly exceeded demand, as reflected in the ongoing struggle of firms to maintain prior levels of productivity. In a market in which supply exceeds demand, the only way in which one supplier can expand its market share is by taking business from others, with a resulting increase in overall competition. And that is precisely what has happened in the legal market since 2008.

A second and perhaps more lasting change is that the market for legal services has shifted from a sellers' to a buyers' market, a shift that has serious long-term implications for the leaders of all law firms. Prior to 2008, the fundamental decisions about how legal services were delivered -- the myriad decisions about how matters were organized, scheduled, and staffed; how strategies and tactics were implemented; and how lawyers charged for their services -- were all essentially made by law firms and not by their clients. This is not to suggest that clients were not consulted or that, from time to time, clients didn't push back, but by and large all of the key decisions relating to a representation were made by outside lawyers.

---

13 These unrelated changes include factors like the growing availability of public information about the legal market, the inexorable drive toward commoditization of legal services enhanced by the growth of enabling technologies, the emergence of non-traditional service providers, the changing role of in-house corporate counsel, the impact of globalization, and the collapse of an unsustainable law firm business and economic model based largely on the ability to raise rates 6-8 percent a year.

7

All of that changed beginning in 2008, when clients – driven to a large extent by an economic imperative to bring down the overall costs of legal services – took control of all of these key decisions. That shift, combined with the dynamic of a market in which supply exceeds demand (as described above), placed clients in control of the relationships with their outside law firms in ways never before seen in the legal market. And clients have not been reluctant to exercise their new leverage.

Over the past five years, clients have talked increasingly about enhancing the "value" they receive for the legal services they purchase,[14] and it has become increasingly clear that what they mean by "value" is efficiency, predictability, and cost effectiveness in the delivery of legal services, quality being assumed.[15] This has led many corporate law departments to retain more work in-house thereby reducing their reliance on outside counsel. Indeed, the 2013 Altman Weil Chief Legal Officer Survey[16] found that, among the 207 CLO respondents, 44 percent indicated that they had shifted work to in-house lawyers during the previous 12 months, and 30.5 percent said that they had reduced the total amount of work sent to outside counsel.[17] Moreover, some 29 percent of respondents indicated that they intended to decrease their overall use of outside counsel in the next 12 months, and only 15 percent said they expected to increase such use.[18] Consistent with these responses, 47 percent of CLOs indicated that they had decreased their budgets for outside counsel during 2013 (a figure that compares to 39 percent in 2012 and 25.4 percent in 2011).[19]

Interestingly, the same client focus on enhanced value in the delivery of legal services may now be evident in a subtle but potentially important shift in the allocation of business within the legal market. In a recent survey conducted by AdvanceLaw,[20] general counsel at 88 major companies were asked about their willingness to move high stakes (though not necessarily "bet the company") work away from "pedigreed firms" (essentially defined as AmLaw 20 or Magic Circle firms) to non-pedigreed firms, assuming a 30 percent difference in overall cost.[21] Of the respondents, 74 percent indicated they would be inclined to use the less pedigreed firm, with only 13 percent saying they would not.[22] In a related question, respondents were asked whether, based on their own experiences, lawyers at the most pedigreed firms were more or less responsive than their counterparts at other firms. Some 57 percent of respondents said that they found lawyers at pedigreed firms less responsive, while only 11 percent said they found them more.[23] Similar results were reflected in the Altman Weil CLO Survey, where 40.5 percent of respondents indicated that they had shifted work to lower priced outside law firms in the preceding 12 months.[24]

---

14 This concept was embodied in the "Value Challenge" program launched by the Association of Corporate Counsel in 2008. See www.acc.com/valuechallenge/.

15 Obviously, corporate general counsel are concerned about the quality of legal advice they receive. Increasingly, however, quality is viewed as the "table stakes" necessary to play in the game to begin with and not a factor for deciding which firm should be awarded a particular piece of work. Stated differently, offering high quality legal advice is essential to getting on a general counsel's list to begin with, but once on the list, it is likely that work will be awarded on the basis of which firm the general counsel believes can deliver the services most efficiently, predictably, and cost effectively.

16 Altman Weil, Inc., *2013 Chief Legal Officer Survey: An Altman Weil Flash Survey*, Nov. 2013 ("Altman Weil CLO Survey").

17 *Id.* at p. 10.

18 *Id.* at p. 4.

19 *Id.* at p. 17.

20 AdvanceLaw is an organization that vets law firms for quality, efficiency, and client service and shares performance information with its membership of some 90 general counsel of major global companies, including the likes of Google, Panasonic, Nike, eBay, Oracle, Deutsche Bank, Kellogg, Yahoo, 3M, ConAgra, Nestle, and Unilever. See http://www.advancelaw.com.

21 The current cost premium for an AmLaw 20 firm relative to an AmLaw 150 or 200 firm is typically far more than 30 percent. As of November 2013, based on Peer Monitor data, the spread between the average standard and worked rates of AmLaw 100 firms and those of AmLaw 2nd 100 firms averaged 22 percent. And, of course, the average for all AmLaw 100 firms is significantly lower than for AmLaw 20 firms alone.

22 The survey question and results are set out at http://hbrblogs.files.wordpress.com/2013/10/badnews-biglaw_580r2.gif.

23 *Id.*

24 Altman Weil CLO Survey, at p. 10.

What these results suggest is that brand value – in this case the brand value of the largest and historically most prestigious firms in the legal market -- may be losing some of its luster as increasingly savvy general counsel select outside law firms based on considerations of price and efficiency and not on reputation alone.   Further tantalizing evidence for this conclusion is provided in the 2013 CounselLink Enterprise Legal Management Trends Report released in October.[25] That report compared the billings of the "Largest 50" U.S. law firms (*i.e.*, firms with more than 750 lawyers) with those of firms in the 200 to 500 lawyer range, the latter being defined as "Large Enough" firms.[26] The report found that three years ago, "Large Enough" firms accounted for 18 percent of all of the billings in the CounselLink data base, while the "Largest 50" firms accounted for 26 percent.  In 2013, the share of "Large Enough" firms had risen to 22 percent, while the share of the "Largest 50" firms had declined to 20 percent. [27]

Looking at high fee work, the CounselLink Trends Report found a similar pattern, at least in respect of high fee litigation matters.  Based on the past three years of billing history for litigation matters with total billings of at least $1 million, the report found that "Large Enough" firms nearly doubled the portion of such work they received, growing their share from 22 percent in 2010 to 41 percent in 2013. [28]

## Challenges of Growth as a Strategy

Against this background, we can return to our initial question -- whether the dominant role played by growth in the strategic thinking of most law firms continues to make sense given the significant changes that have occurred in the legal market?  The most common justifications given for a focus on growth include (i) the desire to achieve "economies of scale", (ii) the necessity of creating an "ever expanding pie" to provide opportunities for younger lawyers and especially younger partners, (iii) the need to diversify to protect a firm against cyclical downturns in specific practices, and (iv) the requirements for a larger market footprint to better serve the needs of clients.  While there is some validity to all of these arguments, they must be balanced against the potential problems created by growth – particularly rapid growth.

As to the desire to achieve economies of scale, it must be noted at the outset that this is a peculiar strategic objective for an industry that continues to be largely reliant on an hourly-billing model.  Economies of scale, as an economic concept, are focused on the creation of efficiencies that allow producers to lower costs and thereby create a competitive advantage.  In the context of the legal industry, however, adding more lawyers (all of whom bill at ever increasing hourly rates) is the antithesis of what economies of scale are supposed to produce.  Even if we assume, however, that economies of scale may be important in the legal industry, there are limits on the benefits that can be derived from growth.

---

25 CounselLink, "Enterprise Legal Management Trends Report – 2013 Mid-Year Edition: The Rise of 'Large Enough' Law Firms," Oct. 2013 ("CounselLink Trends Report").  This report uses data available through the CounselLink Enterprise Legal Management platform, an e-billing system.  Currently, the data base includes 2 million invoices representing more than $10 billion in legal spend and well over 300,000 matters over the past four years.

26 The report explains that the term "Large Enough" is applied to these firms "because firms of this size generally have full-service capabilities across a broad array of practice areas and have the capacity to appropriately staff and handle complex and also high-volume, repetitive legal matters."  CounselLink Trends Report, p.4.

27 *Id.* at p. 5.  These figures, and others included in the CounselLink Trends Report, are based on rolling 12-month totals ending on June 30 of each relevant year.

28 *Id.* at p. 6.

9

Observers of the legal market have commented for some time that the benefits of scale seem to diminish once a law firm exceeds 100 lawyers or so, and that is particularly true if the law firm has multiple offices.[29] Moreover, a comparison of the number of lawyers in AmLaw 200 firms and the profits per partner of such firms shows that there is very low correlation between firm size and profitability.[30] This conclusion was recently confirmed by an analysis of Peer Monitor data for some 132 firms reporting their financial results for 2012. These results showed a very weak relationship between profits per partner and firm size, as well as overall margin (*i.e.*, profit as a percentage of revenue) and firm size. Indeed, firm size had a negative relationship with reported margin figures. Similarly, a regression analysis using 2013 Peer Monitor data from 130 firms showed a very low correlation between firm size and office count with reported expenses per lawyer or with expenses as a percentage of overall firm revenue.[31] Additionally, whatever the potential benefits of economies of scale, the size needed for a firm to achieve such benefits has undoubtedly been lowered in recent years as a result of substantial improvements in technology which have allowed smaller firms to "punch above their weight." [32]

From a strategic point of view, however, the real problem with growth in this context is not just that economies of scale tend to diminish above a certain size. It is rather that, once a firm achieves a certain size, *diseconomies* of scale can actually set in. Large firms with multiple offices -- particularly ones in multiple countries -- are much more difficult to manage than smaller firms. They require a much higher investment of resources to achieve uniformity in quality and service delivery and to meet the expectations of clients (described above) for efficiency, predictability, and cost effectiveness. They also face unique challenges in maintaining collegial and collaborative cultures, particularly in the face of rapid growth resulting from mergers or large-scale lateral acquisitions. In other words, pursuing growth for the purpose of achieving economies of scale can be a mixed blessing.

A similar analysis can be applied to the use of growth as a primary means of creating opportunities for younger partners. While it is true that larger firms may have broader reputations and better name recognition, factors that could be helpful to younger partners in seeking to develop or expand client relationships, it is also true (as described above) that the importance of "brand" as a factor that is considered by clients in selecting outside counsel has diminished in recent years.

---

29  In 2003, Ward Bower of Altman Weil noted:

> For over 30 years, . . . [survey data] has shown, generally, that there are no economies of scale in private law practice. Larger firms almost always spend more per lawyer on staffing, occupancy, equipment, promotion, malpractice and other non-personnel insurance coverages, office supplies and other expenses than do smaller firms. This is counterintuitive, in the sense that larger firms should be able to spread fixed costs across a larger number of lawyers, reducing per lawyer costs, overall. However, that principle does not take into account the excess plant and equipment capacity necessary to support growth, or the increases in staff and communications costs as firms become larger.

Ward Bower, "Mining the Surveys: DISeconomies of Scale?" Altman Weil, Inc. report, 2003.

30  Ed Wesemann, "What Is the Optimum Size for a Law Firm?"
http://edweseman.com/articles/profitability/2011/03/16/what-is-the-optimum-size-for-a-law-firm/. Wesemann notes that profitability does appear to correlate with two other factors, both related to location. First, firms headquartered or having their largest office in New York, Chicago, Washington, Los Angeles, or San Francisco are generally more profitable than similar firms in other cities. And, firms with more than one office are generally less profitable than firms of the same size having only one office, at least until firms exceed 200 lawyers or so in size.

31  Based on analysis by Peer Monitor staff.

32  *See* Ian Wimbush, "Economies of Scale Needed to Set Up a Firm Have Actually Fallen," *The Law Society Gazette*, Sept, 24, 2013. Wimbush notes that "[b]arriers to entry to the legal market have been lowered in recent years, largely due to advances in technology, for example using Cloud-based IT systems."

10

It would seem that, to maximize new business opportunities for younger partners and others, it would be wiser for firms to focus their energies less on growth and more on the issues that clients care about -- responsiveness, efficiency, cost effectiveness, and the like. We will have more to say about that below.

As to the need for firms to diversify their practices, there is obviously wisdom in the notion of attempting to diversify risk by having enough practices to weather a temporary downturn in one or two. That fact, however, does not mean that firms will be successful in moving into areas that are outside their traditional markets or areas of competence -- at least not in the short term. Moreover, given the increased willingness of firms in recent years to weed out "underperforming" partners and practices, the use of risk diversification as a rationale for growth rings somewhat hollow.

Finally, as to the concern about needing a larger market footprint to serve client needs, this can certainly be a legitimate strategic issue for some firms. A firm focused on high-end capital market transactions might well need offices in key capital market centers around the world. An IP firm serving the high tech and biotech industries might see value in offices in Silicon Valley, Route 128, the Dulles corridor, Research Triangle Park, and Austin. A labor and employment law boutique might well justify offices in key major employment centers around the country. Or an energy focused firm might need offices in Houston, Calgary, the Middle East, and Central Asia. But while it may be important for firms in particular markets to have sufficient size to handle large, complex, high-volume matters for clients, even this imperative has its limits. As previously noted, in the CounselLink Trends Report, firms having 200 to 500 lawyers were regarded as "large enough" for these purposes.[33]

The real point is that a particular firm's decision to grow should be made in the context of a clear strategic vision of a market segment that the firm can realistically expect to serve. There is nothing wrong with growth *per se*, and indeed organic, demand-led growth resulting from a firm's successful expansion of client relationships can be very healthy. But growth for growth's sake is not a viable strategy in today's legal market. The notion that clients will come if only a firm builds a large enough platform or that, despite obvious trends toward the disaggregation of legal services, clients will somehow be attracted to a "one-stop shopping" solution is not likely a formula for success. Strategy should drive growth and not the other way around. In our view, much of the growth that has characterized the legal market in recent years fails to conform to this simple rule and frankly masks a bigger problem -- the continuing failure of most firms to focus on strategic issues that are more important for their long-term success than the number of lawyers or offices they may have.

## Changing Strategic Focus

To address the concerns of clients for more efficient, predictable, and cost effective legal services, law firms must focus their attention on re-thinking the basic organizational, pricing, and service delivery models that have dominated the market for the past several decades. While some firms have engaged in such reviews and launched innovative new models to better compete in the current market environment, most have not.

---

33 *See* note 26 *supra*.

In its 2013 Law Firms in Transition Survey report,[34] Altman Weil describes the responses of some 238 managing partners and chairs of U.S. law firms with 50 or more lawyers to a number of questions about their firms' willingness to change their basic operational models. Interestingly, the law firm leaders surveyed clearly understand that the legal market has changed in fundamental ways, with substantial majorities agreeing that *permanent* changes in the market include more price competition (95.6 percent), focus on improved practice efficiency (95.6 percent), more commoditized legal work (89.7 percent), more non-hourly billing (79.5 percent), and more competition from non-traditional service providers (78.6 percent).[35] And 66.7 percent of respondents indicated that they believe the pace of change in the legal market will increase going forward.[36] And yet, only a minority of firms has undertaken any significant changes to their basic business models.

More specifically, 44.6 percent of those surveyed indicated that their firms had taken some steps to improve the efficiency of their legal service delivery,[37] mostly in the form of changing project staffing models to include part-time and contract lawyers and outsourcing some (primarily non-lawyer) functions.[38] Some 45 percent reported that their firms had made significant changes in their strategic approach to partnership admission and retention, primarily in the form of tightening standards or practices for admission to the equity partner ranks.[39] And 29 percent of firm leaders indicated that their firms had changed their strategic approaches to pricing since 2008.[40]

When asked to rank their overall confidence level (on a 0 to 10 scale) in their firms' ability to keep pace with the challenges in the new legal marketplace, the law firm leaders participating in the survey produced a median rating of 7 (in the "moderate" range), with only 12.9 percent indicating a "high" level of confidence.[41] When asked, however, to rate their partners' level of adaptability to change (again on a 0 to 10 scale), the median rating dropped to 5 (in the "low" range), with only 2.2 percent indicating a "high" level of adaptability.[42]

The law firm leaders participating in the survey were also asked how serious they believe law firms are about changing their legal service delivery model to provide greater value to clients (as opposed to just reducing rates). Again using a 0 to 10 scale, respondents produced a median rating of 5 (in the "low" range).[43] That compared to a median rating of 3 given by corporate chief legal officers when asked the same question in October 2012.[44]

The lack of commitment to genuine change reflected in these results seemed confirmed by responses to another question posed to survey participants. Asked to list the greatest challenges their firms face in the next 24 months, the top four answers from respondents (which constituted just over 50 percent of all responses) were all internally focused issues aimed at protecting the *status quo* of the law firm and not at becoming more responsive to clients.[45]

---

34 Thomas S. Clay, *2013 Law Firms in Transition: An Altman Weil Flash Survey*, Altman Weil, Inc., May 2013 ("Altman Weil Report").
35 *Id.* at p. 1.
36 *Id.* at p. 3.
37 *Id.* at p. 9.
38 *Id.* at p. 26.
39 *Id.* at p. 18.
40 *Id.* at p. 8. In a related response, only 31.5 percent of respondents indicated that their firms are primarily proactive in promoting the use of alternative fee strategies with their clients. *Id.* at p. 54.
41 *Id.* at p. 4.
42 *Id.* at p. 6.
43 *Id.* at p. 12.
44 *Id.* at p. 14.
45 *Id.* at pp. v-vi. The top four priorities listed included increasing revenue (15.2 percent), developing new business (14.6 percent), growth (12.4 percent), and profitability (10.7 percent). *Id.* at 62.

Indeed, adding value for clients was only eighth on the list of twelve items (mentioned by 5.6 percent of survey participants) and improving efficiency in service delivery was eleventh on the list (mentioned by only 2.8 percent of respondents).[46]

Against this background, it is somewhat surprising that a majority of the respondents to the Altman Weil survey nonetheless believe that growth (in terms of lawyer headcount) is required for their firms' continued success. Indeed 55.7 percent of those surveyed responded affirmatively to that question, with only 35.7 percent responding negatively.[47] This is surely puzzling in the wake of five years of tepid demand growth and stagnant productivity and with little prospects of a quick turnaround in either of those conditions. One possible explanation is that law firm leaders feel constrained to articulate some kind of strategic vision to help their firms weather the current storm, and the message that we need to "build a bigger boat" is more politically palatable than a message that we need to fundamentally change the way we do our work.

Unfortunately, however, for most law firms, only a commitment to re-think and revise their basic models for managing their professional talent (partners, associates, and others); for delivering their legal services; and for pricing their work is likely to produce competitive success in the long run. This is particularly true if one considers the possibility that the legal market may be currently poised for what could be a dramatic reordering based on the same type of disruptive forces that have reordered many other businesses and industries.

In an intriguing recent article in the *Harvard Business Review*, Clay Christensen, Dina Wang, and Derek van Bever argue exactly that.[48] As they note:

> In our research and teaching at Harvard Business School, we emphasize the importance of looking at the world through the lens of theory – that is, of understanding the forces that bring about change and the circumstances in which those forces are operative: what causes what to happen, when and why. . . . Over the past year we have been studying the professional services, especially consulting and law, through the lens of those theories to understand how they are changing and why. . . .
>
> We have come to the conclusion that the same forces that disrupted so many businesses, from steel to publishing, are starting to reshape the world of consulting [and law]. The implications for firms and their clients are significant.
>
> The pattern of industry disruption is familiar: New competitors with new business models arrive;[49] incumbents choose to ignore the new players or to flee to

---

46 *Id.* at p. 62.

47 *Id.* at p. 35.

48 Clayton M. Christensen, Dina Wang, and Derek van Bever, "Consulting on the Cusp of Disruption," *Harvard Business Review*, Oct. 2013, p. 107.

49 It is interesting to note that, in 2013, we continued to see the emergence of a wide variety of non-traditional service providers vying for market share in the legal space. This was particularly evident in the United Kingdom where sweeping changes to the regulation of legal practice enacted in 2007 have spawned a variety of "alternative business structure" ("ABS") arrangements that permit outside investments in law firms and the formation of multi-disciplinary partnerships in which firms owned by a variety of professionals and investors may offer a wide range of services, including legal services. In two noteworthy developments, DLA Piper announced its investment (along with other private investors) in Riverview Law, a combined barristers' chambers and solicitors' practice to offer fixed-fee commercial services for small- and medium-sized companies. *See* www.riverviewlaw.com/. And British Telecom decided to spin out its motor claims division, commercialize it with an ABS license, and offer claims services to other corporations operating large vehicle fleets. *See* "BT Launches Legal Service for Corporate Customers," *Fleet News*, Apr. 3, 2013, www.fleetnews.co.uk/news/2013/3/4/bt-launches-legal-service-for-corporate-customers/46362/. Meanwhile, in the United States, non-traditional service providers also continued to gain ground in the legal market. *See* Bill Henderson, "Bringing the Disruption of the Legal Services Market into the Law School Classroom," *The Legal Whiteboard*, Law Professor Blogs, LLC, Nov. 23, 2013, listing 16 non-traditional providers currently working actively in the U.S. market. And, in Singapore, it was recently reported that Ernst & Young plans to expand its professional services to the legal services area in the Asia Pacific region. *See* Yun Kriegler, "E&Y Hires Former HSF Partner as It Mulls Singapore Legal Services Launch," *The Lawyer*, Dec. 10, 2013.

higher-margin activities; a disrupter whose product was once barely good enough achieves a level of quality acceptable to the broad middle of the market, undermining the position of longtime leaders and often causing a "flip" to a new basis of competition.[50]

Pointing to the changed and enhanced role of corporate general counsel, the widespread availability of comparative information about law firms and their services, the trend toward disaggregation of services by in-house counsel, and the emergence of new service delivery models and businesses, the authors argue that a disruptive transformation in the legal market may well already be underway. Although acknowledging that the relatively small number of genuinely "bet-the-company" matters may be immune from most of these pressures, the article concludes that ongoing disruption is virtually inevitable.

> The . . . [professionals] we spoke with who rejected the notion of disruption in their industry cited the difficulty of getting large partnerships to agree on revolutionary strategies. They pointed to the purported impermeability of their brands and reputations. They claimed that too many things could never be commoditized in consulting [or law]. Why try something new, they asked, when what they've been doing has worked so well for so long?
>
> We are familiar with these objections — and not at all swayed by them. If our long study of disruption has led us to any universal conclusion, it is that every industry will eventually face it. The leaders of the legal services industry would once have held that the franchise of the top law firms was virtually unassailable, enshrined in practice and tradition — and, in some countries, in law. And yet disruption of these firms is undeniably under way. . . .
>
> \*     \*     \*
>
> [A]lthough we cannot forecast the exact progress of disruption . . ., we can say with utter confidence that whatever its pace, some incumbents will be caught by surprise. The temptation for market leaders to view the advent of new competitors with a mixture of disdain, denial, and rationalization is nearly irresistible. U.S. Steel posted record profit margins in the years prior to its unseating by the minimills; in many ways it was blind to its disruption. As we and others have observed, there may be nothing as vulnerable as entrenched success. [51]

# Conclusion

So, to end where we began -- is growth important as a dominant law firm strategy?  For some firms, the answer is no doubt yes, but for most firms the answer must surely be no. Far more important is to focus on those factors that can help reshape the firm to be more responsive to the needs of clients, to deliver services in a more efficient and predictable manner, and to develop pricing models that reflect more accurately the value of the services being delivered.  For most firms, in other words, the goal should be not to "build a *bigger* boat" but rather to build a *better* one.

---

50 Christensen, Wang, and van Bever, note 49 *supra*, at 107-08.
51 *Id.* at p. 114.

## GEORGETOWN LAW
### Center for the Study of the Legal Profession

**The Center for the Study of the Legal Profession** at Georgetown Law is devoted to promoting interdisciplinary research on the profession informed by an awareness of the dynamics of modern practice; providing students with a sophisticated understanding of the opportunities and challenges of a modern legal career; and furnishing members of the bar, particularly those in organizational decision-making positions, broad perspectives on trends and developments in practice. Georgetown Law's executive education program is an integral part of the Center's activities and uses a rigorous, research-based approach to the development of open enrollment and custom programs on leadership, strategy, leading teams, and collaboration for attorneys in law firms and legal departments. For more information on the Center and the executive education program, contact Mitt Regan at regan@law.georgetown.edu, or visit our websites:

Center for the Study of the Legal Profession and Executive Education
http://www.law.georgetown.edu/academics/centers-institutes/legal-profession/index.cfm

Executive Education
http://www.law.georgetown.edu/continuing-legal-education/executive-education/index.cfm

## PEER MONITOR®

**Peer Monitor®** is a dynamic, live benchmarking program that provides any-time access to critical firm assessment information and allows comparison against selected peers, with details for practice performance. It covers key metrics such as demand, rates, productivity, and expenses broken out by practice groups, offices, and individual timekeepers, enabling easy views to managing partners, practice group leaders, and other law firm leaders at summary and detailed levels. Peer Monitor® is a product of Thomson Reuters, the world's leading source of intelligent information for businesses and professionals. For more information, go to https://peermonitor.thomsonreuters.com.



# 2014 Report on the State of the Legal Market

**GEORGETOWN LAW**
Center for the Study of the Legal Profession

PEER MONITOR®



For more information, please visit us at peermonitor.thomsonreuters.com

© 2014 THOMSON REUTERS